UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

DAVID QUIRK,                                            Case No.: 3:16-cv-0352-AC

                              Plaintiff,                              OPINION AND
                                                                          ORDER

              v.

SKANSKA USA BUILDING, INC.,
a Delaware corporation,

                              Defendant.

_____

ACOSTA, Magistrate Judge:

        Plaintiff David Quirk ("Quirk") sues defendant Skanska USA Building, Inc. ("Skanska"),

asserting multiple state law claims. The claims arise from injuries Quirk sustained while working

on a construction project for which Skanska served as general contractor. Skanska moves for

summary judgment on all claims. For the reasons set forth below, the court grants in part and denies

in part Skanska's motion.[1]

---

[1] The parties have consented to jurisdiction by a United States Magistrate Judge in
accordance with 28 U.S.C. § 636(c)(i).

Skanska served as general contractor for the construction of a Lam Research facility in Tualatin, Oregon. The project included the construction of a cleanroom and various mechanical devices therein. To help complete the job, Skanska hired multiple subcontractors, one of which was Quirk's employer, Charter Mechanical ("Charter"). (Declaration of Ryan J. McLellan, ECF No. 17 ("McLellan Decl."), Ex. A, ("Subcontract")[2]; Declaration of David Quirk, ECF No. 23-1 ("Quirk Decl."), at 1, ¶ 2.)

In November 2013, Skanska and Charter entered into a master subcontract (the "Subcontract") for project-related work including the installation of new piping in the cleanroom. (*See* Subcontract, McLellan Decl., Ex. A, at 1.) Under the Subcontract, Charter was required to provide Skanska with a "work plan" containing a breakdown of Charter's specific activities at the site and the expected time each task would take to complete. (Subcontract, Declaration of Dylan Hydes, ECF No. 23-2 ("Hydes Decl."), Ex.12, at 4, ¶ 3.3.) From that plan, Skanska would develop a master "project schedule" to "coordinate the times required for each area of work on the project" and "decide the time, order and priority for performance of . . . [Charter]'s Work to the extent necessary, in [Skanska]'s judgment, to . . . direct the performance of the Work accordingly." (*Id.* at ¶ 3.4; ¶ 9.2.) If any of Charter's activities conflicted with other work to be completed at the site, Skanska could "direct the performance of [Charter's] Work accordingly" or, in its discretion, direct a "change order" as to Charter's work at any time. (*Id.* at 2–3, ¶ 2.4; 6, ¶10.1.)

---

[2] Neither party submits the Subcontract or Quirk's deposition transcript in full. Rather, each provides different excerpted portions of the documents. The court therefore cites each factual reference with respect to where, or from which party's supporting materials, each fact is sourced. Additionally, all depositions are cited according to their internal pagination.

The Subcontract incorporated as exhibits Skanska's standard code of conduct and environmental health and safety requirements. (Subcontract, McLellan Decl., Ex. A, at 2.) Under those documents, Charter "agree[d] that the prevention of accidents to workmen engaged upon or in the vicinity of the project [wa]s its responsibility." (*Id.* at 6.) Charter also agreed to appoint a designated safety representative and to comply with all applicable laws and rules related to environmental health and safety, including those "established by [Skanska]." (*Id.*)

Skanska also could remove Charter's designated safety representative, stop work because of unsafe conditions, implement safety measures at Charter's expense, and conduct "reasonable unannounced searches" of the work area and of Charter's employees. (Subcontract, McLellan Decl., Ex. A, at 6–9.) Charter was required to comply with Skanska's Fall Prevention and Protection Policy, which required that "no worker exposed to a fall hazard of six (6) feet or greater will work without 100% fall protection," meaning it either had to prevent fall hazards of more than six feet or to provide such fall protection where necessary. (*Id.* at 7.)

Skanska conducted daily safety hazard walks around the job-site, including the cleanroom. (Hydes Decl., Deposition of Miguel Lopez, Ex. 6, at 23:6–12; Deposition of Darren McGill ("McGill Dep."), Ex. 5, at 49:9–50:8; Subcontract, Ex. 12., at 10.) Each day, Skanska led a morning meeting for the subcontractors. (Hydes Decl., Deposition of David Quirk ("Quirk Dep."), Ex.10, at 112:1–22; Deposition of Joseph Gergen, Ex. 7, at 26:5–27:16.) During the meeting, each subcontractor present at the site would report to Skanska about on what and where they intended to work that day, including any relevant safety matters. (*Id.*; Hydes Decl., Deposition of Ben Gaunt, Ex. 2 ("Gaunt Dep."), at 9:20–25,11–3; McGill Dep. Ex. 5, at 42:7–43:17, 57:6–58:9.) If Skanska coordinators detected a conflict, a subcontractor might be redirected. (McGill Dep., Ex. 5,

34:19–23.)

The cleanroom floor consisted of two levels — the central portion of the room was sub-grade, leaving an elevated "ledge" up against the room's four walls. (Quirk Dep., Hydes Decl., Ex. 10, at 26:21–24, 80:7–17; 93:23–24; McGill Dep., Ex. 5, at 22:6–17; 84:5–9; *see* Ex. 14 for photographs.) The ledge measured approximately 18-inches wide and four-feet above the subgrade. (Quirk Dep., Hydes Decl. Ex. 10, at 124:24–125:2; McLellan Decl., Ex. B, at 84:18–20.) The ledge was interrupted along one side of the room by an approximately two-foot wide trench, leaving a hole or opening in the ledge. (Hydes Decl., Ex. 14, at 1, 4; Quirk Dep., McLellan Decl., Ex. B, at 130:10–16.) The opening was covered initially by a large, heavy tile, then later replaced with plywood. (Quirk Dep., Hydes Decl. Ex. 10, at 91:9–92:25; McGill Dep., Ex. 5, at 79:11–80:20.) Those covers were later removed, however, to allow another subcontractor to apply a white, shiny, epoxy-like coating to all of the cleanroom's surfaces, including the floor, the ledge, and the opening. (Hydes Decl., McGill Dep., Ex. 5, at 67:21–68:6; 83:1–7; Gaunt Dep., Ex. 2, at 25:4–12.)

In late March, 2014, Skanska closed the cleanroom to contractors for three to four days to allow the coating to cure. (Hydes Decl., Deposition of Feodor Pukhalsky ("Pukhalsky Dep."), Ex. 4, at 26:9–27:9; Gaunt Dep., Ex. 4, at 13:9–18; Deposition of Robert Filley, Ex. 8., at 22:19–25.) Once cured, Skanska representatives did not replace the cover over the trench because doing so could have compromised the integrity of the coating. (Hydes Decl., McGill Dep., Ex. 5, at 83:4–7, 84:1–5; Gaunt Dep., Ex. 2, at 25:4–12.)

Quirk worked as a pipefitter for Charter on the Lam cleanroom project. (Quirk Decl., ¶¶ 2, 3, 7). On April 2, 2014, the day the cleanroom was reopened after the coating cured, Quirk reported to Skanska's morning meeting, ready to label pipes and replace gauges on the cleanroom's coils.

(Quirk Dep., Hydes Decl., Ex. 10, at 56:1–25.)  At the morning meeting, Skanska representatives announced that the cleanroom was once again accessible to workers, but to protect the new coating, workers entering had to wear booties.  (*Id*.; Gaunt Dep., Ex. 2, at 51:13–53:15.)  No mention was made of the trench and no warning tape surrounded it. (*Id*. at 52:23–53:4; Pukhalsky Dep., Ex. 4, at 49:24–50:10.)  Skanska's meeting leader instructed Quirk and his Charter colleague, Don Condit, to perform their pipefitting work in the cleanroom first, before any other subcontractors.  (Quirk Dep.,  Hydes Decl., Ex. 10, at 56:4–25.)

Quirk had worked in the cleanroom more than 20 times previously, the most recent occasion being four weeks prior.  (Quirk Dep., McLellan Decl., Ex. B, at 91:11–17.)  He had seen Skanska and other Charter employees stand on the ledge before to accomplish their work in the cleanroom. (Quirk Dep., Hydes Decl., Ex. 10, at 80:3–6.)  He was aware the trench existed, but he had never needed to stand on the ledge or cross over it, because the trench always had been covered.  (*Id*. at 92:10–16; McGill Dep., Ex. 5, at 79:2–7.)  According to both Quirk and another subcontractor working in the cleanroom that day, the new, shiny, white appearance of the coating caused the trench to blend in with the surrounding ledge.  (Quirk Dep., Hydes Decl., Ex. 10, at 95:4–7 ("it was brand new painted white and everything was shiny and looked the same"); Pukhalsky Dep., Ex. 4, at 55:11–56:6 ("anybody could have fell in there because it kind of blends in").)

To access the pipe gauges, Quirk climbed onto the ledge and walked, "sidestepping," along it. (Quirk Dep., Hydes Decl.,  Ex. 10, at 80:21–81:6; McLellan Decl., Ex. B, at 76:11–78:2, 80:3–6.) Quirk testified he believed walking sideways was safer than walking straightforward because he could hold on to the "ribs" of the wall.  (*Id*.)  Without "see[ing]" the trench, Quick stepped into it, hitting his back on its angle iron-corner.  (Quirk Dep., Hydes Decl., Ex. 10, at 84:18–20.)  He

suffered physical injuries as a result. (*Id*.; Hydes Decl., Ex. 11; McLellan Decl., Ex. B, at 111:15–18.)

Quirk filed suit against Skanska in state court, alleging violation of the Oregon's Employer Liability Law ("ELL") and the Oregon Safe Employment Act ("OSEA") and asserting claims of negligence and negligence *per se.* (*See* Complaint, ECF No. 1, at 4–9.) Skanska timely removed the case to this court, (Notice of Removal, ECF No. 1), and now moves for summary judgment on all of Quirk's claims ("Motion"). (Def.'s Mot. for Summ. J., ECF No. 16, ("Motion").)

*Preliminary Procedural Matters*

In its reply brief, Skanska objects to and moves to strike portions of Quirk's response brief and supporting materials. The court addresses each evidentiary objection in turn.

I.      Subsequent Remedial Measures.

Quirk proffers evidence of what he deems subsequent remedial measures instituted by Skanska after his accident. Skanska objects that such evidence as inadmissible under Federal Rule of Evidence ("FRE") 407.

Though evidence of subsequent remedial measures ordinarily is prohibited to show a defendant's negligence, under Oregon law, such evidence is admissible in cases brought under the ELL. *Rich v. Tile-Knot Pine Mill*, 245 Or. 185, 199 (1966). Federal Rule of Evidence 407, however, generally prohibits such evidence. FED. R. EV. 407 ("When measures are taken that would have made an earlier injury or harm less likely to occur, [such] evidence . . . is not admissible to prove [] negligence; culpable conduct; . . . or a need for a warning or instruction."). The Ninth Circuit has held that even where state law governs substantive questions, in diversity cases, evidentiary admissibility is governed by federal law. *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010); *see*

*e.g., Rosa v. Taser Int'l, Inc.*, 684 F.3d 941, 948–49 (9th Cir. 2012) (analyzing liability under California law but applying FRE 407 to exclude a subsequent warning because "Rule 407 [i]s sufficiently procedural in nature to apply in diversity cases under *Erie R.R.* Co. *v. Tompkins*, 304 U.S. 64[] (1938)") (citation omitted)); *Clare v. Timber Prod. Co. P'ship*, No. CIV. 1:11-3024-CL, 2012 WL 629964, at *8 (D. Or. Feb. 23, 2012) (admitting evidence of subsequent remedial measures in Oregon ELL context, but only to show control).

The FREs, however, "do not supplant all state law evidentiary provisions with federal ones." *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003) (internal quotation and citation omitted). "[S]tate evidence rules that are intimately bound up with the state's substantive decision making must be given full effect by federal courts sitting in diversity." *Id*. Exemplary is the admissibility of unilaterally recorded conversations under California state law. *Id*. at 667. Because the California penal code criminalizes the taping of such conversations and "limits the admissibility of illegally intercepted conversations," and the California Constitution "expressly guarantee[d] a right to privacy," the tapes' admissibility is governed not by the FREs but by state law. *Id*.; *see also Wray v. Gregory*, 61 F.3d 1414, 1417 (9th Cir.1995) (holding federal courts applying Nevada substantive law also must apply Nevada evidentiary rules on admissibility of the state's medical malpractice screening panel rulings because the panels "constitute[d] a central feature" in the state's "established and integrated scheme for handling medical malpractice claims").

Citing *Rich*, Quirk argues the evidence of subsequent remedial measures here is admissible "due to the substantive law governing the ELL" because the ELL requires employers to "use every device, care and precaution which it is practicable to use for the protection and safety of life and limb." (Pl.'s Supp. Resp. Br. at 2 (quoting the ELL language on which the Oregon Supreme Court

in *Rich* relied).)

The evidence at issue here does not fall within the *Feldman* exception. To be sure, the *Rich* court appears to have based its ELL subsequent remedial measures exception on the statute's requirement that specific safety measures be implemented. But affirmatively requiring certain safety measures does not equate to criminalizing the collection of evidence itself, as was the case in *Feldman*. Quirk does not provide any state constitutional or statutory support to suggest the ELL contains any specific evidentiary rules analogous to those in the California law in *Feldman*. Thus, Quirk fails to show that the judicially created exception in *Rich* evidences a state substantive policy interest sufficient to override FRE 407's application in this case.

However, FRE 407 permits the admission of subsequent remedial measures evidence for the purpose of showing control, if control is disputed. FED. R. EVID. 407 ("[T]he court may admit this evidence for another purpose, such as impeachment or — if disputed — proving ownership, control, or the feasibility of precautionary measures.") Control is disputed here: much of the controversy in this case centers on who controlled the cleanroom and the trench at the time of Quirk's injury. Therefore, the evidence Quirk proffers is admissible, though to show only control. Accordingly, Skanska's second evidentiary objection is sustained, except to the extent the evidence of subsequent remedial measures is relevant to prove control.

II.    Admissions of Fault.

According to Quirk's deposition testimony, a Skanska representative admitted fault for the accident during a subsequent meeting between the parties. (*See* Quirk Dep., Hydes Decl., Ex. 10, at 120:17–122:13.) Quirk could not recall exactly who made this representation. (*Id.*) Skanska argues the statement is inadmissable hearsay made by an unknown declarant under FRE 802. Quirk

contends the statement is non-hearsay under exclusion FRE 801(d)(2)(D).

Hearsay is an out-of-court statement, whether oral or written, offered into evidence to prove the truth of the matter asserted. FRE 801(a), (c). Hearsay is inadmissible unless it is defined as non-hearsay under FRE 801(d) or falls within a hearsay exception. *See* FED. R. EV. 802; 30B Michael H. Graham, FEDERAL PRACTICE & PROCEDURE: EVIDENCE § 7031 (2017 ed.) Under FRE 801(d)(2)(D), "a statement [] offered against an opposing party and . . . made by the party's agent or employee on a matter within the scope of that relationship while it existed" is non-hearsay and, therefore, admissible.

Skanska argues the FRE 801(d)(2)(D) does not apply here because Quirk cannot identify who made the statement and thus cannot establish that the exclusion's elements are satisfied.

Conclusory, speculative testimony is insufficient to raise a genuine issue of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979). Quirk, as the offering party, must demonstrate that the statement at issue meets the requirements of FRE 801(d)(2)(D). Quirk's testimony fails to identify the admitting declarant's identity. Without that information, the court cannot determine whether the declarant was Skanska's agent or employee, as the exclusion requires. *Cf. United States v. Gonzalez-Valdez*, 321 F. App'x 683, 684 (9th Cir. 2009) (reversing trial court's admittance of unknown declarant's statements because offering party failed to prove statements fell under co-conspirator hearsay exception when "there [wa]s no evidence other than the alleged co-conspirator's statements themselves that would establish . . . a conspiracy between the defendant and the unknown, unidentified caller"). As a result, the statement remains inadmissible hearsay and is stricken from the record.

III.     Incomplete Interrogatory Responses.

Finally, Skanska moves to strike allegations in Quirk's response brief related to workplace safety violations under Oregon Revised Statute ("ORS") 654.310 and Oregon Administrative Rules ("OARs") 437-002-0022 and 437-003-1500, because the allegations were not included as answers to Skanska's interrogatories.  Skanska served Quirk with interrogatories requesting he set forth and describe " the bas[e]s for liability against Skanska, including . . . any . . . ordinance, administrative regulation, or any other . . . rule . . . [he] claim[s] Skanska violated."  (Def.'s Reply Br. at 4.)  Quirk responded but did not include allegations based on ORS 654.310 or OAR 437-002-0022 and 437-003-1500.  He later referenced those statute and rules in his response brief in conjunction with his OSEA and negligence *per se* claims.  Hence, Skanska argues that Federal Rules of Civil Procedure ("Rules") 33 and 26, which require answering parties to respond fully to interrogatory questions and to correct or supplement incomplete interrogatory responses, compel striking the allegations.

Quirk concedes he failed to include the aforementioned bases in his interrogatory response, but defends, first, that Skanska had sufficient notice of the implication of OAR 437-002-0022, which imposes "additional Oregon general [workplace safety] requirements," because discovery discussions and collection centered on the subject and, as such, no prejudice would ensue from the allegation now.  Second, he argues that ORS 654.310, which is the second of the two substantive statutory provisions comprising the ELL, and OAR 437-003-1500, which contains only a definition, fell outside the scope of the interrogatory request.

Rule 12(f) authorizes the court to strike from the pleadings "any redundant, immaterial, impertinent, or scandalous matter," FED. R. CIV. P. 12(f), but such requests "are generally viewed with disfavor, and will usually be denied unless the allegations in the pleading have no possible

relation to the controversy, and may cause prejudice to one of the parties." *Champlaie v. BAC Home Loans Servicing, LP*, 706 F. Supp. 2d 1029, 1039 (E.D. Cal. 2009); *see also Patapojf v. Vollstedt's, Inc.,* 267 F.2d 863, 865 (9th Cir. 1959) (noting "the interests of justice are best served by [hearing a case] on the merits.") The absence of prejudice is a sufficient reason to deny moving defendants' motion to strike. *See, e.g., N.Y.C. Emps.' Ret. Sys. v. Berry*, 667 F. Supp. 2d 1121, 1128 (N.D. Cal. 2009) ("Where the moving party cannot adequately demonstrate . . . prejudice, courts frequently deny motions to strike even though the offending matter was literally within one or more of the categories set forth in Rule 12(f)." (citation and internal quotation marks omitted)).

By its express language, however, Rule 12(f) applies only to material contained in a "pleading." *See Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983) ("only pleadings are subject to motions to strike"); *Sokoli*, 2015 WL 7720466, at *3 (D. Idaho Nov. 27, 2015) ("Rule 12(f) allows a motion to strike a pleading, not a motion. A motion is not a pleading."). Generally, therefore, arguments contained in motions, briefs, and memoranda may not be attacked by a motion to strike. *See Act Now to Stop War & End Racism Coal. v. D.C.*, 286 F.R.D. 117, 125 (D.D.C. 2012), vacated sub nom. *Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. D.C.*, 846 F.3d 391 (D.C. Cir. 2017) (vacated on other grounds) ("motions, affidavits, briefs, and other documents outside of the pleadings are not subject to Rule 12(f)"). However, courts on occasion have exercised their discretion to treat such motions as procedurally proper evidentiary objections challenging the admissibility of the supporting record. *See e.g., Sokoli*, 2015 WL 7720466, at *4; *see also Natural Resources Defense Council v. Kempthorne*, 539 F. Supp. 2d 1155, 1161 (E. D. Cal. 2008) ("[A] motion to strike materials that are not part of the pleadings may be regarded as an invitation by the movant to consider whether [proffered material] may

properly be relied upon." (citing *U.S. v. Crisp*, 190 F.R.D. 546, 551 (E. D. Cal. 1999) ("[A] motion to strike has sometimes been used to call courts' attention to questions about the admissibility of proffered material in [ruling on motions].")).

Skanska does not argue the aforementioned allegations rely on inadmissible evidence. Because the allegations are found in a pre-trial motion, not a pleading, Skanska's motion to strike such arguments is procedurally improper.

Even if it were not, the court does not strike the arguments from the record. Skanska does not argue the allegations here would be prejudicial; it asserts only that they should have been included in Quirk's interrogatory response. Skanska by now is aware that the aforementioned rules constitute bases for Quirk's suit; has been afforded the chance to respond to the arguments; and, as the record demonstrates, has conducted extensive discovery on the topics central the allegations. (*See* Hydes Decl., Exs. 15–17.) Moreover, regardless of the scope of the interrogatory, ORS 654.310 and OARs 437-002-0022 and 437-003-1500 represent only minor, supporting aspects of some of Quirk's claims. OAR 437-003-1500, in particular, merely provides a related definition; OAR 437-002-0022 is relevant only to establish an underlying safety violation to support Quirk's OSEA claim; and ORS 654.310 is asserted only indirectly, to establish an underlying violation to support Quirk's negligence *per se* claim. Therefore, because the allegations relate to the controversy, little prejudice would result from their introduction here, and in light of the strong judicial preference for deciding matters on their merits, Skanska's third motion to strike is denied.

### Legal Standard

A court grants a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(a).  The moving party bears the burden of establishing that no issue of fact exists and that the nonmovant cannot prove one or more essential elements of a claim or defense.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  If the movant meets its burden, the nonmovant must "go beyond the pleadings [ ] by her own affidavits . . . [to] designate specific facts showing that there is a genuine issue for trial."  *Id.* (internal quotation marks omitted).  Conclusory allegations unsupported by factual material such as affidavits and documentary evidence are insufficient to defeat a motion for summary judgment.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  On summary judgment, the court must view all facts in a light most favorable to the nonmovant and draw all justifiable inferences in the nonmovant's favor.  *Narayan v. EGI, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010).

*Discussion*

I.    Oregon Employer Liability Law.

Quirk's first claim arises under the Oregon Employer Liability Law ("ELL"), ORS §§ 654.305–.336.  Section 654.305 of the"ELL imposes a heightened statutory standard of care on a person or entity who is either in charge of, or responsible for, any work involving risk or danger." *Woodbury v. CH2M Hill, Inc.*, 335 Or. 154, 159 (2003).  Under this heightened standard of care,

> Generally, all owners, contractors or subcontractors and other persons having charge of, or responsibility for, any work involving a risk or danger to the employees or the public shall use every device, care and precaution that is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices.

OR. REV. STAT. § 654.305.  Quirk alleges Skanska violated that standard by leaving the cleanroom trench uncovered, without a warning or adequate precautions to prevent a fall.  Skanska seeks summary judgment, arguing first that the ELL does not apply to the circumstances of Quirk's

accident and, second, that the vice principal rule bars the ELL claim because Quirk was a foreman at the time of his injury.

   *A.*     *Risk or Danger.*

Skanska contends the ELL does not apply here because Quirk's work in the cleanroom did not involve "risk or danger." Skanska defines Quirk's "work" as the narrow task he was performing at the time of his injury — replacing the temporary test gauges with permanent gauges. Quirk argues his "work" also encompassed the location and circumstances of the task.

The Oregon Supreme Court has interpreted "work involving a risk or danger to . . . employees" under ORS § 654.305 to include both the worker's discrete task and the circumstances under which the worker performs that task. *Woodbury*, 335 Or. at 161. In *Woodbury*, a defendant-contractor hired a plaintiff-subcontractor to construct a "decontamination pad" at a job-site, which entailed installing a pipe connecting the pad to adjacent equipment. *Id.* at 157–58. The pipe was suspended over a ten-foot pit, and to build it, workers constructed a temporary platform on which to stand. *Id.* at 162. The subcontractor later was tasked with dismantling the platform, and doing so, was injured when he lost his balance and fell into the pit below. *Id.* at 158. The subcontractor sued under the ELL and for negligence. *Id.* at 159. Interpreting the language of the ELL, the Oregon Supreme Court reasoned,

> The words "any work" are inclusive, suggesting that the reference is to the tasks in which the employee was engaged. The phrase "involving a risk or danger" modifies "any work." Thus, identifying the relevant scope of the work for purposes of the ELL requires an initial determination of whether the work involved a risk or danger to the employees or the public. "Risk" and "danger" are both words of common usage. *Webster's Third New Int'[l] Dictionary* 573 (unabridged ed 1993) indicates that "risk" and "danger" are synonyms for each other, as well as for "peril," "jeopardy," and "hazard." Webster's first modern definition of "danger" is "the state of being exposed to harm: liability to injury, pain or loss: PERIL, RISK." *Id.* Similarly, Webster's defines "risk" as "the possibility of loss, injury, disadvantage,

or destruction: CONTINGENCY, DANGER, PERIL, THREAT." *Id*. at 1961. Thus, as used in ORS 654.305, "risk" or "danger" refers to conditions of the work that create the possibility that a worker will suffer harm.

*Id*. at 161. The court therefore rejected the decision below that described the "work involving a risk or danger" as merely "moving the boards to facilitate disassembly of the platform," instead holding that the "work involving risk or danger" the subcontractor had performed more broadly "included requiring plaintiff to work at height during the assembly, use, and disassembly of the platform." *Id*. at 162.

Thus, for purposes of the ELL, Quirk's work in the cleanroom involved not only the gauge replacement but also the location and manner in which he had to access the gauges, which included navigating the ledge and the uncovered trench.

Skanska next argues that the fall hazard posed by the trench was insufficient to constitute a risk or danger because of the trench's shallow depth. Quirk contends that determination is one for the jury.

Whether work involves risk or danger under the ELL is a question of fact that the court may resolve at summary judgment only if no reasonable jury could conclude that risk or danger was involved. *Golden v. Ash Grove Cement Co.*, No. CV 06-336-PK, 2007 WL 1500168, at *4–5 (D. Or. May 21, 2007) (declining to "invade the province of the jury to" determine whether a "risk or danger was involved where [plaintiff] was required to slide a heavy gangway along a metal track subject to blockage by falling debris"); *Snyder v. Seneca Lumber Co.*, 297 Or. 572, 577 (1956) ("Ordinarily, the question of whether a particular employment is inherently dangerous is for the jury to decide . . . and it is only in clear cases that the court is authorized to decide, as a matter of law, that the work does not involve risk or danger.").

Here, a reasonable jury could conclude that the presence of an unmarked, uncovered, visually obscured trench created a "risk or danger" for Quirk's work in the cleanroom. Skanska rightfully notes that ELL cases involving fall hazards have usually involved heights greater than four feet. *See, e.g.*, *Woodbury*, 335 Or. at 158, 161–62 (ten-foot fall); *Spain v. Jones*, 257 Or. App. 777, 779, 793–94 (2013) (nine-foot fall). But in so arguing, Skanska ignores other potentially hazardous circumstances that could have rendered the trench dangerous: the necessity of walking on the ledge, the narrow width of the ledge, the lack of warning or barrier about the newly uncovered trench, the potentially disorienting epoxy coating. Skanska also cites no authority to support the implied premise of its argument: that only falls from a certain height are subject to the ELL's coverage and falls below that height simply do not constitute risk or danger. Indeed, whether a particular height presents risk or danger is the very determination a jury must make. Thus, construed in a light most favorable to Quirk, these circumstances create a genuine issue of material fact as to whether Quirk's work in the cleanroom involved a risk or danger.

Finally, Skanska argues that the accident here bore no "no relationship to the uncommon risks or dangers associated with . . . pipefitting," offering that under *McLean v. Golden Gate Hop Ranch of Or.*, 195 Or. 26, 29 (1952), "the proper focus is on the nature of the duties of the injured employee *in connection with the injuries sustained*." (Motion at 10 (emphasis in original).)

McLean worked as a "lacer" for the defendant-farmer, which involved cutting vines while walking immediately in front of a crop-collecting truck, atop of which sat a detachable "crows nest" platform. *McLean,* 195 Or. at 29–30. The day of the accident, after McLean's crew had already finished harvesting their crop load and driven back to a storage area for unloading, McLean stood next to the loaded truck when she was struck by a heavy piece of equipment another worker had

thrown from the top of an adjacent truck. *Id.* at 31. Addressing McLean's ELL claim, the Oregon Supreme Court held that because McLean "was engaged in ordinary farming operations[,]" and "[n]one of the work incident to the harvesting of the hops in the field was inherently dangerous[,]" McLean's duties were "not accompanied by any more risk or danger than is present in any ordinary crop-harvesting operation, or other nonhazardous occupation." *Id*. at 34–35.

*McLean* reflects an older, more limited concept of ELL liability, common in other cases of the era. *See, e.g., Wells v. Nibler*, 189 Or. 593, 598 (1950) (holding that sawing a limb from a tree was not dangerous as a matter of law, noting "[f]rom time immemorial men, women and children have climbed trees and sawed off limbs without anything further required than agility and a saw"), *overruled by Quick v. Andresen,* 238 Or. 433, 440 (1964) (discussed below).

Since that time, the Oregon appellate courts have moved away from this narrow view, instead embracing the broader construct explained in *Woodbury*, discussed *supra. See, e.g., Snyder*, 207 Or. at 577 (holding that, although scaling logs "in and of itself is not a hazardous occupation," it was for jury to decide whether doing so in the vicinity of "hazardous" logging activities posed a risk or danger)*; Richardson v. Harris,* 238 Or. 474, 476–77 (1964) (holding "the question of risk or danger [wa]s for the jury" when plaintiff-farmer worker "struck his knee on a steel rung" while climbing a ladder inside a grain elevator); *Quick v. Andresen,* 238 Or. 433, 440 (1964) ("it is the particular work being done at the time, not the general type of employment, that determines risk or danger."); *Kruse v. Coos Head Timber Co.*, 248 Or. 294, 304 (1967) (plaintiff's injury caused by falling timber in an enclosed tower necessarily created a "jury question whether the work was so inherently dangerous or presented dangers so uncommon that the employment would be classed as work involving 'risk or danger'").

In fact, *McLean* rarely has been cited in the decades since; one of the only such examples is *Helland v. Hoffman Const. Co. of Oregon*, No. 3:11-CV-01157-HU, 2013 WL 5937001 (D. Or. Nov. 3, 2013). That court invoked *McLean* to bar ELL recovery for a steamfitter who was injured on his way to a construction site when the school bus he was riding in, driven by the general contractor, crashed. *Id.* at *5–*6. The court "c[ould ]not say Helland's work at the time of his injury involved risk or danger simply because it was incidental to the duties he would later perform during his workday after arrival at the work site." *Id*. at *5. Therefore, "there [wa]s no genuine issue of fact as to whether Helland's work as a steamfitter was rendered inherently dangerous by [the contractor]'s use of an old school bus to transport workers to the construction site." *Id*. at *6.

*McLean*'s application in *Helland* illustrates that under current ELL case law, *McLean*'s lasting jurisprudential significance, if any, is that to recover under the ELL, a plaintiff's injuries must be attributable to the work plaintiff actually performs, as opposed to conditions unrelated or merely incidental to his duties. Unlike *McLean* or *Helland*, Quirk was injured in the direct vicinity of and in the process of performing the gauge replacement. And, under *Snyder*, even if pipefitting is not itself an inherently dangerous occupation, as detailed above, a reasonable jury could find that performing such work in the vicinity of an active construction site, particularly one containing narrow, uneven walking surfaces and an uncovered trench, involves a risk or danger. Thus, summary judgment as to the risk or danger of Quirk's work in the cleanroom is inappropriate.

B.      *Indirect Employer Liability*.

Skanska also refutes liability under the ELL based on its indirect employment relationship with Quirk.

The ELL allows an injured employee to bring suit against not only direct employers but also

"indirect employer[s]," *Brown v. Boise-Cascade Corp.*, 150 Or. App. 391, 396 (1997) (citing *Miller v. Georgia–Pacific Corp.*, 294 Or. 750, 754 (1983)), such as "owners, contractors or subcontractors . . . ." ORS 654.305. An entity may be subject to indirect employer liability if it "(1) is engaged with the plaintiff's direct employer in a 'common enterprise'; (2) retains the right to control the manner or method in which the risk-producing activity was performed; or (3) actually controls the manner or method in which the risk[-]producing activity is performed." *Woodbury*, 335 Or. at 160 (citing *Wilson v. P.G.E. Company*, 252 Or. 385, 391–92 (1968)).

As a threshold matter, though the language of the indirect employer test first articulated in *Wilson* refers to "risk-producing activity," rather than risk-producing "work," as worded in ORS 654.305, the *Woodbury* court made clear that the indirect employer analysis embraces the same, broad definition of "work involving risk or danger." *See Woodbury* 335 Or. at 160–63 (reversing lower court's "narrow" construct of "work involving risk or danger" within the context of its indirect employer liability analysis); *see also Spain*, 257 Or. at 793–94 (implicitly equating a "risk-producing activity" with "work involving a risk or danger" under the ELL). Thus, the relevant "risk-producing activity" for purposes of the ELL's indirect employer analysis likewise includes the conditions and circumstances surrounding the activity, as outlined *supra* in Part I.A.

1.    *Common Enterprise.*

Skanska denies engaging in a common enterprise with Quirk's employer, noting it did not participate in or know how to perform Charter's pipefitting tasks and that no Skanska employees were present in the cleanroom when Quick fell. Quirk contends Skanska necessarily engaged in a common enterprise with Charter because Quirk could not perform his job without relying on Skanska to provide safe access to the cleanroom.

A "common enterprise" exists if (1) both the direct (plaintiff's employer) and the indirect (defendant) employer "participate in a project of which the defendant employer's operations are an 'integral' or 'component' part," (2) "the work must involve a risk or danger," as required by ORS 654.305, (3) the plaintiff must be an "employee" of the defendant employer, and (4) "the defendant must have charge of or responsibility for the activity or instrumentality that causes the plaintiff's injury." *Sacher v. Bohemia, Inc.,* 302 Or. 477, 486–87 (1987) (internal citations omitted). To satisfy the third factor, a plaintiff must be "1) an 'adopted' employee . . . ; 2) an 'intermingled employee' . . . ; or 3) an employee of an independent contractor hired by the defendant where the defendant retains or exercises a right to control the risk-creating activity or instrumentality." *Id.* at 486.

With respect to *Sacher*'s first factor, both Charter and Skanska participated in the cleanroom construction, and, as general contractor, Skanska's operations were integral to that project. Second, as the "risk or danger" analysis *supra* demonstrates, there is at least a genuine issue of material fact as to the risk or danger posed by Quirk's work.

Skanska's argument here, addressing only the parties' joint participation or intermingling, neglects the other, alternative sources of common enterprise. *Sacher* makes clear that joint participation and intermingling of employees are sufficient, but not necessary, to trigger common enterprise liability. The third *Sacher* factor accepts alike (1) "adopted" and (2) "intermingled" employees and (3) independent contractors' employees if the hiring defendant has sufficient control over the risk-creating activity or instrumentality. Because Quirk appears to fit most squarely into the final of those categories, in this case, the third and fourth *Sacher* factors converge into the single inquiry of whether Skanska retained or exercised a right to control the activity or instrumentality that caused Quick's injury.

Skanska levies the balance of its common enterprise argument on the fact it did not control Charter's pipefitting activities at the site. But the Oregon Supreme court has held that the risk-creating activity includes furnishing safety equipment to be used in the general operation. In *Thomas v. Foglio*, from which the *Sacher* court extracted its fourth factor, a subcontractor's employee was injured loading logs onto the back of defendant's parked logging truck when one of the logs slipped. *Thomas v. Foglio*, 225 Or. 540, 542–43 (1961). The defendant was responsible for, but failed to, provide a safety platform intended to protect against such a scenario. *Id.* at 543, 551. The defendant conceded responsibility for the instrumentality — the platform — but argued it had no control over the plaintiff's activity — the loading of the logs. *Id.* at 551. The court, however, held the defendant indeed "had 'charge of' and was 'responsible for' that part of the job or 'work' which consisted of furnishing safe equipment to be used in a loading operation." *Id.* at 550.

Under *Thomas*, the relevant risk-creating activity here included not only the discrete pipefitting tasks, but also furnishing and maintaining a safe workplace in the cleanroom. Based on the record, it appears Skanska had charge of the overall coordination of the work conducted by various subcontractors at the site, directing who entered and worked on specific areas of the cleanroom at any given time. And it was Skanska, the only party who knew the trench was uncovered that day, that made the decision to leave the trench uncovered and to not furnish any type of safety equipment related to the uncovered trench. That Skanska later identified corrective actions it could take to prevent similar future occurrences — including deeming the "subfloor area off limits unless arrangements [are] made with [the] Skanska superintendent" and installing a temporary "trench plate," (Hydes Decl., Ex. 11) — supports that Skanska had significant charge of the cleanroom workplace. Thus, under *Thomas*, Skanska may have had sufficient control over the risk-

creating activity to trigger common enterprise indirect employer liability.

But even if Skanska did not have charge of the risk-creating activity, under *Sacher*, Skanska still could be liable under a common enterprise theory if it retained or exercised sufficient control over the injury-producing instrumentality. Few of the common enterprise cases the parties cite are helpful on this point, because most stemmed from situations in which the subcontractor — not the contractor — clearly and solely was in charge of the specific injury-causing instrumentality. *See Sacher*, 302 Or. at 489 (noting defendant was "not shown to be in charge of or responsible for the design, maintenance or operation of the [] saw unit" that caused the plaintiff's injury); *Brown*, 150 Or. at 397 (in which an subcontractor's injured employee failed to use proper safety equipment supplied by the subcontractor); *Yeatts Whitman v. Polygon Northwest Company,* 360 Or. 170, 172 (2016) (in which an injured subcontractor's employer decided to use guardrails as the safety method at the site and constructed the guardrail that ultimately failed).

*Schroeder v. Northrop Servs., Inc.,* 86 Or. App. 112 (1987) exists as one of the only ELL cases to address a risk-creating instrumentality. Schroeder, an Environmental Protection Agency ("EPA") employee, worked in an EPA laboratory alongside employees of Northrup, with which EPA had contracted to "provide[] services" in the lab. *Id.* at 114. The lab workers "used the same equipment and chemicals," and a Northrup employee developed the lab's procedures. *Id.* When concerns arose about the lab's ventilation system, both EPA and Northrup representatives attended a safety meeting to address the problem. *Id.* at 115. A consultant, who "reported" only to the EPA, concluded the system posed no "significant health or safety problem." *Id.* All lab employees returned to work, and Schroeder was injured by harmful chemical vapors that evaded the ventilation system. *Id.* at 115. Later investigations were inconclusive on whether those vapors were those used

by EPA or Northrup employees in the lab. *Id.* at 115 n. 4.

The trial court held Northrup was not engaged in a common enterprise with EPA, because it was EPA, plaintiff's direct employer and lab owner, that maintained responsibility for the ventilation system. *Id*. at 116–17. Schroeder appealed, arguing the chemicals, not the ventilation system, were the pertinent risk-creating instrumentality. *Id*. at 117. The Oregon Court of Appeals held that a reasonable "jury could find that the chemical vapors, and not the ventilation system . . . , were the instrumentality that created the risk to plaintiff and his co-workers." *Id*. at 118–19. Therefore, and because "defendant's employe[e] developed the procedures used in the lab, and []undertook to inspect the lab for the workers' safety[,]" a genuine issue of material fact existed as to *Sacher*'s fourth factor. *Id*. at 119. Notably, that factual issue precluded summary judgment not only "under the 'common enterprise' test," but also "under the 'right to control' test [and] under the 'actual control' test," *id*., discussed *infra* in Parts I.B.2–3.

Thus, regardless of what a jury would have found the instrumentality at issue in *Schroder* to be, the parties there participated in and shared responsibility for both the ventilation system and the vapors. As such, *Schroder* suggests that even partial control over the risk-creating instrumentality is sufficient to create a question of fact for the jury as to common enterprise.

Unlike in *Schroeder*, here, there is no debate as to the definition of the risk-creating instrumentality — the uncovered trench. Skanska, focusing only on the risk-creating activity, does not offer any arguments about its control over the trench. Again, the record supports that Skanska had at least partial, if not complete, control over the trench that day. It appears to have been Skanska that placed and maintained the covers over the trench prior to the coating application, and Skanska that decided and required the trench to remain uncovered thereafter. Skanska directed Quirk and

Condit to enter the cleanroom to perform their gauge replacement that day. Though Skanska required booties to be worn to protect the coating, it neither warned of or pointed out the location of the uncovered trench, nor instituted any other new, additional safety measures to be implemented in the cleanroom. Under *Schroeder*, that is enough to raise a factual question as to *Sacher*'s fourth prong and, consequently, to preclude summary judgment on common enterprise liability. Furthermore, *Schroeder* also directs that this fact issue precludes judgment as a matter of law also as to the right to control and actual control tests, outlined below.

    2.    *Right to Control.*

Quirk contends Skanska is liable as an indirect employer also because it retained the right to control Charter's work through the "extensive controls over [] work and safety" in the cleanroom, many of which stemmed from the master subcontractor agreement. (Pl.'s Resp. Br., at 19.) Skanska argues it had the "right [only] to require addition[al] safety measures on some aspects of the jobsite" — not the right to require safety measures with regard to the injury-producing activity. (Motion at 14.)

To establish a defendant's right to control the pertinent risk-producing activity, a plaintiff must "identify some source of legal authority for that perceived right." *Yeatts*, 360 Or. at 184 (citing *Boothby v. D.R. Johnson Lumber Co.*, 341 Or. 35, 41 (2006)). That source may be statutory, *see, e.g.*, *Cortez v. Nacco Material Handling Grp., Inc.*, 356 Or. 254, 274 (2014) (basing defendant's right to control on the state's "governing [LLC] statutes"), or contractual, *see, e.g., Boothby*, 341 Or. at 41 (basing defendant's right to control on "specific [contractual] provisions"); *Yeatts*, 360 Or. at 192 (discussed *infra*).

A defendant-contractor may not retain a right to control a subcontractor's risk-producing

activity if the operative subcontract, when read as a whole, expressly releases "sole" control over work to a subcontractor. *Boothby*, 341 Or. at 41. Boothby worked for a logging subcontractor hired by a timber owner to harvest logs, when he was injured while operating a log loader. *Id.* at 38. Under the contract, the subcontractor had "agreed to 'be solely responsible for providing and maintaining all equipment, safety and technique," and the "[owner] '[wa]s interested only in the results to be achieved and, except for the timing of [logging] operations, the conduct and control of the [logging] work w[ould] lie solely with [plaintiff's employer].'" *Id.; Boothby v. D.R. Johnson Lumber Co.*, 184 Or. App. 138, 141 (2002). Based on those "unambiguous" terms, the court held the owner retained no right to control the subcontractor's work. *Boothby*, 341 Or. at 43.

Conversely, a contractor may retain such a right when the relevant subcontract assigns to the subcontractor responsibility for at least "some" job-site safety matters. *Yeatts*, 360 Or. at 192. In *Yeatts Whitman v. Polygon Northwest Company,* Polygon, a general contractor, subcontracted with Yeatts's employer to perform framing work on a residential development. *Id.* at 173. The subcontract provided the framer would be "primarily responsible for safety measures for the framing work and required it to protect Polygon from liability for injuries that might befall [the subcontractor]'s employees doing that work." *Id.* at 184. Even so, the contractor "retained some right to control the framing work, including related safety matters." *Id.* The subcontractor was required to "take all necessary safety precautions pertaining to its work" and required it to comply with all applicable safety rules and regulations "and any safety measures requested by [Polygon]." *Id.* at 185. Polygon's Accident Prevention Plan, which governed the job-site but was not distributed to the subcontractor, also required the contractor to inspect the construction site daily for safety hazards. *Id.* The Oregon Supreme Court held that "retention of the rights to require additional safety

measures, and to inspect the work site in its entirety, particularly in the absence of a contractual provision that placed sole responsibility for safety measures on [the subcontractor], constituted sufficient evidence that Polygon retained the right the control . . . so as to preclude summary judgment." *Id.* at 192.

Skanska argues that *Yeatts* requires Quirk to establish also that Skanska "retained the right to require additional safety measures as to the risk[-]producing activity." (Motion at 14 (citing *Yeatts*, 390 Or. at 192).) This argument suffers from two flaws. First, the argument misconstrues *Yeatts*. The *Yeatts* court did not add another requirement to the right to control test. Rather, as outlined above, the "retention of the rights to require additional safety measures" was but one factor of at least three on which the *Yeatts* court relied in its holding and therefore supports, but is not necessary, to prove a right to control the risk-producing activity exists.

Second, even if *Yeatts* does add such a requirement, under *Woodbury*'s broad construct of "risk-producing activity," Quirk has presented evidence to meet that additional burden. Skanska concedes it "did retain the right to require addition [sic] safety measures on some aspects of the jobsite," but not "those safety measures with regard to the activity that produced Plaintiff's injury." (Motion at 14.) But, as discussed *supra* in Part I.A, the proper scope of the "risk-producing activity" for the indirect employer analysis is the broader definition of "work involving risk or danger."

The Charter Subcontract, like that in *Yeatts*, assigns some but not all responsibility for job-site safety to Charter. And retained in the Subcontract, is the right to require additional safety measures related to Charter's work. The Subcontract's language mirrors that in *Yeatts* almost exactly: "[Charter] agrees to comply with all . . . laws, ordinances, and rules . . . concerning environmental health and safety that are applicable to the Work . . . *and with environmental, health*

*and safety standards established by [Skanska] . . . .*" (McLellan Decl., Ex. A, at 6) (emphasis added.)  Notably, unlike in *Yeatts*, where the contractor's accident prevention plan was enforced but never distributed to the subcontractor, here, Skanska expressly incorporated its Code of Conduct and Environmental Health and Safety Requirements into the Subcontract as the operative standard governing Charter's work at the site.  Skanska also retained the right remove Charter's designated safety representative, stop work because of unsafe conditions, implement safety measures at Charter's expense, and conduct "reasonable unannounced searches" of the work area and of Charter's employees.  (*Id.* at 6–9.)  If the right to require additional safety measures, including inspection rights combined with the right to inspect the job-site, absent a subcontractor's sole assumption of safety responsibility, were sufficient to preclude summary judgment on right to control in *Yeatts*, then based on the Charter Subcontract and the significant safety control rights Skanska reserved therein, *a fortiori*, summary judgment here too is denied.

      3.     *Actual Control.*

Finally, Skanska also denies indirect employer status under the theory of actual control, arguing it controlled neither the method nor manner of Quirk's work, nor provided any instruction or direction as to Quirk's specific tasks in the cleanroom that day.  Again, that interpretation of "risk-producing activity" is too narrow and ignores other means of control that can give rise to actual control.

To be liable under the ELL, an indirect employer need not exercise actual control over a subcontractor's specific task; it is enough if it actually controls the work involving risk or danger as a whole.  *Woodbury*, 335 Or. at 163; *see, e.g.,Spain v. Jones*, 257 Or. App. 777, 794 (2013) (denying summary judgment on actual control after a subcontractor painter fell at job-site because a jury could

have found defendant-indirect employer actually controlled "the 'work involving a risk or danger'—specifically, the work involving a risk of falling — [which] included not only plaintiff's installation of plumbing fixtures on the second floor, but also his walk along the unprotected second-floor hallway").

Particularly relevant to actual control is whether the indirect employer exercised actual control over the aspect of the work that rendered it dangerous. *Woodbury*, 335 Or. at 163. In *Woodbury*, a subcontractor fell from a temporary platform constructed to help him access a suspended pipe. *Id*. at 158. The subcontractor relied on the contractor's "safety coordinator, who was at the job-site everyday for guidance on both physical and chemical hazards present in that industrial setting." *Id*. at 162. A contractor representative "instructed [the subcontractor] to install the two-inch pipeline" and provided "detailed instructions as to how the pipeline should be constructed." *Id*. After weighing different options on how best to build the pipe, both parties "jointly decided to use" the platform, which the contractor instructed the subcontractor to construct. *Id*. "In light of those facts," the Oregon Supreme Court held that "there was evidence from which the jury reasonably could conclude that defendant exercised actual control both over the decision to use a wooden platform and over the choice of how that platform was constructed." *Id*. In particular, "the jury could have concluded that the platform was constructed without fall protection that might have protected plaintiff from injury." *Id*. at 162–63. Thus, there was evidence "to support a jury finding that defendant exercised actual control over the manner or method in which the risk-producing activity (working at height) was performed and, therefore, defendant was liable under the ELL." *Id*.

Skanska attempts to distinguish *Woodbury* from the instant case by pointing to the *Woodbury*

contractor's "detailed" instructions to the subcontractor on how to construct the pipe, noting that here, Skanska had no input on how Quirk was to replace the gauges in the cleanroom. But again, that argument employs too narrow a construct of the risk-producing activity. The contractor's "detailed instructions" on which the *Woodbury* court relied were not limited to the subcontractor's specific task at the site (constructing a decontamination pad), but instead included guidance from the contractor's safety coordinator regarding "physical [] hazards present in [the] industrial setting." *Id.* at 162.

Skanska, like the *Woodbury* defendant, had substantial control over job-site access at the Lam facility and safety precautions in the cleanroom. Charter accessed and worked in the cleanroom at the direction and discretion of Skanska's representatives, who controlled not only who entered the cleanroom but also when the various subcontractors would enter. (*See* Hydes Decl., McGill Dep., Ex. 5., at 80:24–25 ("So Skanska really owned this area[, the ledge and the opening,] when we were doing this work and I knew why they had to protect the trench").) Skanska also held morning meetings intended to highlight and broadcast specific physical hazards at the site each day. Charter also relied, at least in part, on Skanska's safety inspectors. It was Skanska who controlled the trench in the ledge, the existence of which is what rendered Quirk's work dangerous. In contrast to *Woodbury*'s jointly-made decision on what safety precautions to take, the record here establishes that the decision not to cover the trench was attributable solely to Skanska. Finally, the subsequent remedial measures Skanska identified in its post-incident report, restricting cleanroom sub-floor access to only those cleared by Skanska's superintendent and installing a trench cover, (*see* Hydes Decl., Ex. 11), again confirm that Skanska exercised substantial control over both the cleanroom and the trench. Therefore, a reasonable jury could here too find that Skanska exercised actual control

over the work involving a risk or danger in the cleanroom.

In conclusion, Skanska reasonably could be found to be an indirect employer subject to ELL liability under theories of common enterprise, right to control, and actual control.

### C. Vice-Principal Exception.

Skanska also argues Quirk's ELL claim is barred under Oregon's vice-principal exception because he served as a job-site foreman at the time of his injury. Quirk denies that status, noting that he had no authority to hire or fire subordinates.

"Simply stated, the vice-principal rule is that an employee to whom an employer delegates the duty to see that the statutory requirements of [the ELL] are carried out has no claim against an employer for a violation of those statutes if the injuries result from the employee's failure to see that the required safety measures are taken." *Miller v. Georgia-Pac. Corp*., 294 Or. 750, 757 (1983) (en banc) (citing *Skeeters v. Skeeters*, 237 Or. 204, 220–21 (1964)). The vice-principal rule derives from ORS 654.315, which provides: "The owners, contractors, subcontractors, foremen, architects or other persons having charge of the particular work, shall see that the requirements of [the ELL] are complied with." Because "supervision and control pervades" ORS 654.315, whether an employee is a vice principal turns on his or her "authority, powers of discretion, and duties . . . ." *Skeeters*, 237 Or. at 221–22.

Unlike the indirect employer analysis's broad concept of work, in accordance with ORS 654.315's reference to "particular work," the vice-principal inquiry focuses more narrowly on the "very activity giving rise to the injury." *Miller*, 294 Or. at 758 (involving an injury during a quality-control inspection of a tractor blade and holding that the particular work at issue was the "extrication of the blade," rather than the inspection itself). The vice-principal rule applies in both direct and

indirect employer cases. *See Miller*, 294 Or. at 759 n.3 (permitting a defendant-indirect employer to assert the defense on retrial). Whether an employee is a vice-principal in charge of particular work is, "peculiarly," a question of fact. *Skeeters*, 237 Or. at 220 (citing, among other cases, *Bartley v. Doherty*, 225 Or. 15, 27 (1960)).

For example, in *Howard v. Foster & Kleiser Co.*, the court found the plaintiff acted as a vice principal when he was charged with inspecting and servicing billboards and subsequently fell from a ladder doing so. *Howard v. Foster & Kleiser Co,* 217 Or. 516, 545 (1958) (en banc). The man was responsible for inspecting the ladder prior to use; had the authority to choose which ladder he would use, to use alternate equipment, and to select which order the billboards would be serviced; had "considerable control" over expenses; and had the discretion and power to direct the work of his "helper." *Skeeters,* 237 Or. at 222 (summarizing *Howard*, 217 Or. at 542–44).

The power to hire and fire other employees is "relevant" and suggestive of vice principalship, but that factor alone is not dispositive. *Id.* at 222. In *Skeeters*, an employee was struck by an air-borne rock while he operated a rock crusher. *Id.* at 208–09, 215. The man sued his employer, which defended the claim was barred because the man was a vice-principal. *Id.* at 220. The trial court denied the employer's motion for a directed verdict on the vice-principal issue, a jury found for the man, and the employer appealed. *Id.* at 213. Oregon Supreme Court affirmed, characterizing the employee as a "general utility man" who operated the machine "incidental to the[] schedule set by defendants." *Id.* at 221. The employee "had no authority to determine the size of the rock produced by the machine; no authority to determine its location; and no authority to direct the work of other employees." *Id.* Nor could he hire or fire other employees, which, to the court, "may be a circumstance indicative of his status as a person in charge." *Id.* at 222.

Skanska supports its vice-principal defense by offering Quirk's deposition testimony, in which Quirk describes himself as a "foreman" on the job. (Quirk Dep., McLellan Decl., Ex. B, at 30:9–25.) First, under *Skeeters*, that testimony, though relevant, does not carry dispositive weight in the vice-principal analysis. Second, that self-claimed title came in the context of discussion surrounding union positions, wages, and benefits — not Quirk's duties or authority at the site. (*Id.*)

More important to this court's analysis are Quirk's powers of discretion, duties, and authority, including but not limited to the power to hire and fire other employees, with respect to his particular work, which, per *Miller*, is the specific gauge replacement.

Based on the record, Quirk had less control over his duties than did the *Howard* plaintiff. It does not appear Quirk handled any expenses or selected the order in which the gauge replacement would take place. Nor does it appear Quirk had much discretion with respect to when or where the gauge replacement was to take place in the cleanroom. Rather, like the employee in *Skeeters*, he timed and performed his work at Skanska representatives' direction.

However, until the fall cut his day short, Quirk was to exercise his substantive pipefitting expertise on how to perform the specific gauge replacement. He also was responsible for submitting a pre-task plan, which should have included any safety concerns related to the gauge replacement. But Skanska ultimately was responsible for reviewing that plan and identifying any conflicts internally or with other subcontractors' plans.

Additionally, as a union foreman on the Lam Research job, it appears Quirk was in a position of some authority over his colleague, Condit, whom Quirk described as his "partner." (Quirk Dep., McLellan Decl., Ex. B, at 62:14–15.) Quirk at least once directed Condit to fetch tools, and Condit testified that Quirk was his "foreman," in a supervisory role. (Quirk Dep., Declaration of Sean K.

Conner, ECF No. 25 ("Connor Decl"), Ex. A, at 66:16–17; Deposition of Donald Condit, Ex. B, at 17:9–10, 39:13–15 .) There is no evidence, however, that Quirk had the authority to hire or fire any Charter employees.

Moreover, there was another Charter representative superior to Quirk working at the Lam facility that day, Charter Superintendent Joseph Gergen, who attended the morning meeting. (*See* Quirk Dep., McLellan Decl., Ex. B, at 61:12–62:15; *see also* Hydes Decl., Ex. 7, Deposition of Joseph Gergen.) Though it remains unclear exactly what Gergen's role or duties were at the site, but Quirk's testimony suggests Gergen approved Quirk's work in the cleanroom. (Quirk Dep., McLellan Decl., Ex. B, at 62:5–9 ("had a brief discussion with Joe saying, [a]ll right, Joe, I'm going to go get those gauges – the temporary gauges off and install the new ones and label the pipe. And Joe said, [f]ine, go for it.").)

Thus, the record supports both Skanska's and Quirk's arguments of Quirk's status as a person in charge. Viewing, as the court must, the facts in the light most favorable to Quirk, and because the question of vice-principalship under Oregon law is one of fact, a genuine issue of material fact exists such that summary judgment on this issue would be premature.

In sum, Skanska could be found to be liable under the ELL as an indirect employer and because factual questions remain about whether the vice-principal rule bars recovery here. Thus, summary judgment on Quirk's ELL claim is denied.

II. Oregon Safe Employment Act.

Quirk's second claim for relief, under the Oregon Safe Employment Act ("OSEA"), alleges Skanska failed to "furnish [] Quirk with a safe place of employment by failing to adopt such practices, means, methods, operations, and processes that are reasonably necessary to render

employment safe . . . ." (Compl. ¶ 12 (citing generally ORS §§ 654.001–.295).) Skanska challenges that the OSEA does not provide a direct civil remedy, but that even if it does, the regulations Quirk claims Skanska violated do not apply.

The Oregon legislature enacted the OSEA "to assure as far as possible safe and healthful working conditions for every working man and woman in Oregon." OR. REV. STAT. 654.003. Though the OSEA does not expressly create a private right of action for violations of its provisions, courts have found an implied right of action exists for OSEA violations "based on theories of statutory tort rather than on negligence *per se*," if the circumstances of the case meet the four-part test set forth in *McAlpine v. Multnomah County*, 131 Or. App. 136 (1994). *Cain v. Bovis Lend Lease, Inc.*, 817 F. Supp. 2d 1251, 1265–67 (D. Or. Sept. 13, 2011); *see also Williamson v. Munsen Paving, LLC*, No. Civ. 09-736-AC, 2009 WL 4505443, at *1,*4–*5 (D. Or. Nov. 30, 2009) (holding plaintiff "may bring a cognizable claim against [defendant-owner] under the [OSEA]"). Under the *McAlpine* test, a plaintiff must show: "1) defendants violated a statute; 2) plaintiff was injured as a result of that violation; 3) plaintiff was a member of the class of persons meant to be protected by the statute; and 4) plaintiff suffered the type of injury the statute was intended to protect against." *McAlpine*, 131 Or. App. at 144; *see also George v. Myers*, 169 Or. App. 472, 478 (2000) (clarifying that, in the OSEA context, the "statute" defendants must have violated is "the OSEA safety regulations").

    *A.*    *Statutory Violation.*

*McAlpine* first turns on whether the defendant is subject to the OSEA, that is, whether the defendant was an "employer" or, relevant here, "owner" for purposes of the statute. *Cain*, 817 F. Supp. 2d at 1266–67. "Unlike the ELA, 'the OSEA does not extend its coverage to indirect

employers.'" *George* 169 Or. App. at 478 (quoting *German v. Murphy*, 146 Or. App. 349, 357 (1997)). However, in addition to direct employers, the OSEA also extends liability to "owners." OR. REV. STAT. 654.022; *Brown v. Boise-Cascade Corp.*, 150 Or. App. 391, 404 (1997). ORS 656.015 describes an owner's duty under the OSEA: "No employer or owner shall construct or cause to be constructed or maintained any place of employment that is unsafe or detrimental to health." Owners also must "comply with every requirement of every order, decision, direction, standard, rule or regulation prescribed by the Department of Consumer and Business Services in connection with the matters specified in" the OSEA, "or in any way relating to or affecting safety and health in employments or places of employment, or to protect the life, safety and health of employees in such employments or places of employment." OR. REV. STAT. 654.022.

Under ORS 656.005(6), "owner" is defined broadly as "every person having ownership, control or custody of any place of employment or of the construction, repair or maintenance of any place of employment." As the Oregon Supreme Court explained,

> The tenor of the OSEA's provisions with regard to an 'owner's' responsibilities arguably suggests that the 'owner' is one who enjoys some degree of involvement with the work or workplace. Even though the word 'owner' is ambiguous, as demonstrated by []Oregon cases and statutes [], it is nonetheless clear that the OSEA defines an owner in three alternative ways: First, as a person who has 'control' of a place of employment. Or second, as a person who has 'custody' of a place of employment. Or third, as a person 'having ownership' of a place of employment.

*Moe v. Beck*, 311 Or. 499, 505 (1991).

In *Moe v. Beck,* a defendant rental company leased a truck to a third party that, in turn, subleased the truck to Moe's employer. *Id.* at 501–02. Moe was injured when the truck's brakes failed, and he sued under the OSEA, alleging that the company had violated various applicable safety regulations, including one requiring that vehicles have effective brake systems. *Id.* Because "[t]he

[leasing] contract gives the defendant the right to enter the premises 'and inspect the [truck] or observe its use[,]'" and absent "legislative history indicating . . . legislative intent [] that the OSEA not apply to persons in the position of the defendant," the Oregon Supreme Court "interpret[ed] the OSEA to include a lessor in the position of the defendant within the definition of 'owner.'" *Id.* at 505.

The Oregon Court of Appeals in *Brown*, 150 Or. App. at 408, later refined that definition of "owner." The court acknowledged that under *Moe*, "at least in some circumstances, ownership of a premises where OSEA violations occur is sufficient to support negligence per se liability even if the defendant had no direct involvement in, or control over, the injury-producing activity." *Id.* at 407. But the court, concerned that "[r]ead broadly, *Moe* could be viewed as subjecting owners to negligence per se liability any time a worker is injured on premises because of an OSEA violation . . . regardless of the owner's relationship to the worker or to the OSEA violation," added that a "defendant owner is liable only if the regulation whose violation underlies the OSEA claim is one that either explicitly, or by nature, imposes obligations on owners of premises." *Id*. at 407–08. The court reasoned,

> *Moe* itself is exemplary. There, the ordinary and foreseeable use of the 'workplace' that the defendant owned — the dump truck — was driving. Providing and maintaining adequate brakes was essential to the continuing structural integrity and safe operation of that 'workplace' in its ordinary and intended manner. Thus, although the regulations underlying the plaintiff's . . . claim in *Moe* did not expressly refer to owners, the defendant there was nevertheless subject to those regulations . . . .
>
> Conversely, other [Oregon safety] regulations, which pertain to work practices or methods, as opposed to requirements pertaining to workplace structures or safeguards, may not apply to owners. For example, nothing in the text or context of the OSEA suggests that owners (as distinct from employers) are subject to requirements pertaining to lifelines, safety belts, or lanyards. *See, e.g.*, OAR 437–03–1926.28 . . . .

*Id.*

Though *Brown* was silent as to whether its refinement of *Moe* also narrowed OSEA liability of contractors as "owners" under the statute, the disjunctive phrasing of the OSEA's three categories of "owner[s]" under ORS 656.005(6) suggests that contractors, too, still can be liable for OSEA violations post-*Brown* so long as the violated regulation underlying the OSEA claim is one that either explicitly, or by nature, imposes obligations on someone in the contractor's position. *See also George,* 169 Or. App. at 484 (2000) (analyzing whether defendant-general contractor was "owner" under OSEA and concluding that because the underlying safety regulation at issue applied to only "employers," defendant was not liable); *Cain*, 817 F. Supp. 2d at 1267 (suggesting that defendant-general contractor could be "an 'owner' . . . for purposes of the OSEA"). Thus, the question of OSEA owner liability reduces to the nature of the underlying violation and to whom it applies. *See, e.g.,Williamson v. Munsen Paving LLC,* No. CV 09-736-AC, 2010 WL 1063575, at *4 (D. Or. Mar. 2, 2010), *report and recommendation adopted,* No. CIV. 09-736-AC, 2010 WL 1224232 (D. Or. Mar. 19, 2010) ("With th[e] guidance [of *Moe* and *Beck*], the court turns to the specific regulations cited by Williamson to determine which, if any, of those regulations apply to owners.")

Quirk alleges Skanska violated both Occupational Safety and Health Standard ("OSHA") regulation 29 CFR § 1910.23(a), which the Oregon Department of Consumer and Business Services adopted by reference in OAR 437-002-0005, and Oregon Occupational Safety and Health Code ("OOSHC") Rule OAR 437-002-0022. Both of these regulations, in addition to several other OSHA and OOSHC rules discussed in the subsections that follow, have been amended since the time of Quirk's accident. The court considers the regulations as they were in force in April 2014, when the accident occurred.

1.    *OSHA Regulations*.

29 CFR §1910.23, in relevant part, provides:

Every floor hole into which persons can accidentally walk shall be guarded by either:

(i) A standard railing with standard toeboard on all exposed sides, or

(ii) A floor hole cover of standard strength and construction. While the cover is not in place, the floor hole shall be constantly attended by someone or shall be protected by a removable standard railing.

29 CFR §1910.23(a)(8).

Skanska argues 29 CFR § 1910.23 does not apply because that rule is superceded by a more specific regulation, 29 CFR § 1926.502.

The OSHA regulations direct that "[i]f a particular standard is specifically applicable to a condition, practice, means, . . . or process, it shall prevail over any different general standard which might otherwise be applicable to the same condition, practice, means, . . . or process."  29 CFR § 1910.5(c)(1).  If no more "particular standard[] applies," "any standard shall apply according to its terms to any employment and place of employment in any industry, even though particular standards are also prescribed for the industry."  29 CFR § 1910.5(c)(2).  "To illustrate, the general standard regarding noise exposure in § 1910.95 applies to employments and places of employment in pulp, paper, and paperboard mills covered by § 1910.261."  *Id*.  Thus, if a specific industry standard does not apply to a given situation, the applicable general standard will govern.

29 CFR § 1926.502 is housed not in Part 1910's general occupational health and safety standards , but in Part 1926's specific "construction" standards.  *See* 29 CFR § 1926 et seq.  29 CFR § 1926.502 requires that "[e]mployers shall provide and install all fall protection systems required by [§ 1926.502] for an employee and shall comply with all other pertinent requirements of [§

1926.502] before that employee begins the work that necessitates the fall protection." 29 CFR § 1926.502(a)(2). Required fall protection measures include "covers for holes in floors . . . and other walking/working surfaces" and warnings "marked with the word 'hole' or 'cover' to provide warning of the hazard." 29 CFR § 1926.502(i)(1–4).

As an initial matter, it is unclear whether 29 CFR § 1926.502 supercedes 29 CFR §1910.23 in this case. The former is more specific as to the industry; the latter is more specific with respect the feature covered and safety measures to be instituted. There is little direction from the language or context of either to suggest whether the trench is a "hole in the floor" subject to § 1926.502, or a "floor hole into which persons can accidentally walk," as described in §1910.23. The parties were engaged in construction industry activities at the Lam facility. But just as OSHA's exemplary general noise exposure standard applies to pulp, paper, and paperboard mills workplaces, so too would a generally applicable hole cover provision apply to a construction workplace. Therefore, under the requisite 29 CFR § 1910.5(c) analysis, the question of whether § 1926.502 applies to the trench is a close one.

If § 1910.23 applies, it provides little direction as to who — employer or owner — is responsible for covering the floor hole.

The Oregon Court of Appeals faced a similar situation in *Brown*, where, like here, the safety regulation at issue was worded without reference to the actor responsible. *Brown*,150 Or. App. at 412–13 (interpreting regulation providing only that "Construction areas . . . where work is in progress shall be lighted with either natural or artificial illumination."). Absent such reference, the court answered the "close" question by returning to *Moe*'s proposition that safety measures that pertain to workplace structures or safeguards apply to owners under the OSEA, and ultimately

concluded that because "the lighting requirements [we]re defined by reference to the general structure and function of the work area . . . [, they we]re similar to the brake requirements in *Moe* and should support owner liability." *Id.* at 413.

This court employed a like analysis in *Williamson*, interpreting a regulation stating "All vehicles must have a working horn that can be heard above surrounding area noise." *Williamson*, 2010 WL 1063575, at *6. The court concluded that "[r]equiring a backup alarm for a vehicle . . . is clearly a safety measure" that pertained to the workplace at issue, therefore the owner was liable despite the regulation's silence as to the responsible party. *Id.* (citing *Moe*, 100 Or. App. at 180–81)).

Applying that framework here, the requirements of § 1910.23(a)(8), like those in *Brown*, are defined by reference to the general structure and function of the work area and, ergo, similar to those in *Moe*. Here, the relevant work area is the cleanroom — more specifically, its ledge — and the analogous safeguard is a cover, surrounding railing, or warning. Those safeguards pertain directly to the cleanroom ledge. Therefore, under *Moe, Brown,* and *Williamson*, Skanska, as an owner who had control and custody of the cleanroom, was responsible for those safeguards and, therefore, subject to § 1910.23(a)(8).

Skanska argues that even if § 1910.23(a)(8) applies, the trench was not a "floor hole" covered by the rule and, therefore, no violation occurred. Skanska contends, first, that § 1910.23(a) applies only to floor holes "related to stairways, ladderways, hatchways and chutes, skylights, pits and trapdoors, and manholes." (Motion at 20 (citing generally § 1910.23(a).) That argument misconstrues the provision. Section 1910.23(a) contains standards for "protection for floor openings," dovetailing into subsections addressing various types of floor openings. For example,

§ 1910.23(a)(1) governs "stairway floor opening[s]," while § 1910.23(a)(2) covers "ladderway floor opening[s.]" Section 1910.23(a)(8), however, applies more universally to "[e]very floor hole into which persons can accidentally walk . . . ." Thus, under its plain language, § 1910.23(a)(8) applies to any hole into which someone could fall, whether it be associated with a stairway, ladderway, or any other building feature.

Skanska next asserts that the opening in the ledge was not a "floor hole into which persons can accidentally walk" because it did not also meet the definition of a "floor hole" under a related definitions provision, 29 CFR § 1910.21(a)(1).

Section 1910.21(a) provides,

As used in § 1910.23, unless the context requires otherwise, floor and wall opening . . . terms shall have the meanings ascribed in this paragraph.

(1) Floor hole. An opening measuring less than 12 inches but more than 1 inch in its least dimension, in any floor, platform, pavement, or yard, through which materials but not persons may fall; such as a belt hole, pipe opening, or slot opening.

(2) Floor opening. An opening measuring 12 inches or more in its least dimension, in any floor, platform, pavement, or yard through which persons may fall; such as a hatchway, stair or ladder opening, pit, or large manhole.

29 CFR § 1910.21(a).

Skanska does not specify which part of the § 1910.21(a)(1) definition the cleanroom trench offends; it simply concludes that "[t]here is no evidence that the trench into which [Quirk] fell met this definition . . . ." (Def.'s Reply Br., at 14.) The most plausible argument here is that because the gap in the trench was approximately 2-feet wide in its least dimension, it qualifies as a floor "opening," and not a floor "hole."

Even this argument, however, falls short when carried to its logical conclusion. Under its

own directive, § 1910.21(a)'s definitions yield where "context requires otherwise." Section § 1910.23(a)(8) expressly applies to "[e]very floor hole into which persons can accidentally walk . . . ." Under § 1910.21(a)(1), a "floor hole" is less than 12 inches in its least dimension. To accept Skanska's regulatory construction here would accept that the only hole into which a person could accidentally walk is one narrower than 12 inches. The more logical interpretation is that the text of § 1910.23(a)(8) speaks for itself and applies to every floor gap into which a person could walk, be it a "hole" of less than 12 inches or an "opening" of 12 or more. That § 1910.23(a) lacks a separate safety standard for permanent floor "openings" further supports this interpretation.

But even if instead it is § 1926.502's construction standards that govern the trench, adopting Skanska's position here would lead to a perverse outcome, run counter to regulatory intent, and conflict with Oregon OSEA case law. Because § 1926.502(a)(2)'s fall protection requirements apply only to "employers," Charter, as Quirk's employer, would be the entity responsible for protecting Quirk and Condit from the uncovered cleanroom trench. For Charter to have abided by that requirement, it would have had to anticipate that the trench existed and where it was located. As discussed above, the record suggests only Skanska was immediately aware of the trench's existence, location, and uncovered condition that morning. To construe the OSHA regulations in a way that would require Charter to cover a trench about which it did not know is illogical and contrary to the overlying purpose of both the OSEA and the Occupational Safety and Health Act of 1970, from which the OSHA regulations are derived: to "assure as far as possible safe and healthful working conditions for every working man and woman . . . ." OR. REV. STAT. 654.003; 29 USC § 651(b) (purpose of OSHA's regulatory scheme is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions . . . .").

Finally, such an interpretation also would run afoul of the reasoning in *Moe* and *Brown*. As discussed *supra*, *Moe* articulated a broad construction of "owner" under the OSEA. The text of the OSEA and *Moe* both make clear that the OSEA imposes owner status on an entity that has control or custody of a place of employment. *Brown* limited that liability to the extent that the underlying regulation supporting the OSEA claim must apply to the entity held liable. But in so holding, the *Brown* court implicitly recognized that the underlying regulation at issue need not expressly mention owner liability, so long as there is sufficient level of "involvement in, or control over, the injury-producing activity." *Brown*, 150 Or. App. at 408 (citing *Moe*, 311 Or. at 504–05) (reconciling that "although the regulations underlying the plaintiff's negligence *per se* claim in *Moe* did not expressly refer to owners, the defendant there was nevertheless subject to those regulations" because "[p]roviding and maintaining adequate brakes was essential to the continuing structural integrity and safe operation of that 'workplace' in its ordinary and intended manner"). Accordingly, to shield Skanska from liability here, when Skanska alone had knowledge and control over the opening in the ledge and custody of and controlled access to the cleanroom, is contrary to *Moe* and *Brown*.

2.    *OOSHC Regulation.*

Oregon Occupational Safety and Health Code Rule OAR 437-002-0022 sets forth state health and safety requirements "additional" to adopted federal regulations, and in relevant part at the time of the accident, provided:

> Aisles, passageways, and walkways shall be of adequate width for their intended or actual use, and in no event shall they be less than 22 inches wide. Passageways which are elevated more than 4 feet above the ground or floor level shall be provided with standard railings. . . . Aisles, passageways, walkways, and inclines shall be . . . free of holes, unevenness, . . . or debris.

OAR 437-002-0022(3)(a),(f). Thus, like 29 CFR § 1910.23(a)(8), OAR 437-002-0022(3) is silent

as to whom it applies.

Skanska first argues the regulation does not apply because the OOSHC has adopted by reference both the interpretive rules of 29 CFR § 1910.5 and the specific construction standards in 29 CFR § 1910.502, thus, like 29 CFR § 1910.23, OAR 437-002-0022, too, is superceded by the more specific 29 CFR § 1910.502.

The Oregon Department of Consumer and Business Services has adopted many of the federal OSHA standards, including 29 CFR § 1910.5 and § 1910.502. OAR 437-002-0005(5); OAR 437-003-0001(13). But as discussed above, the same flaws in Skanska's § 1910.502 argument also are present here. Namely, it is unclear whether the construction-specific standard indeed supercedes OAR 437-002-0022. And, even if it does, as applied to the facts of this case, under *Moe*, *Brown*, and *Williamson*, Skanska may still be responsible as an owner because the requirements pertain directly to the cleanroom and its ledge, over which Skanska had substantial, if not sole, control and custody. Moreover, the aforementioned OSHA standards were adopted "[i]n addition to, and not in lieu of, any other safety and health codes contained in OAR Chapter 437 . . . ." OAR 437-002-0005(5); OAR 437-003-0001(13). It is therefore unlikely that OAR 437-002-0005 should be interpreted as directing that an adopted OSHA standard to supercede an additional, Oregon-specific standard like OAR 437-002-0022.

Nevertheless, OAR 437-002-0022(3) does not apply here because it does not appear the cleanroom trench qualifies as one of the building features contemplated by the rule.

OOSHC Chapter 437, Division 2, Subdivision D provides general standards for "walking-working surfaces." Within that subdivision, subsection OAR 437-002-0022(3) outlines specific standards for "aisles, passageways, walkways, [and] inclines."

Quirk does not specify how the cleanroom ledge qualifies as any of the aforementioned building features; he simply contends OAR 437-002-0022(3)(a) and (f) apply to all "walking-working surfaces" as defined broadly in OAR 437-003-1500(7). However, that definition comes from and applies only to the separate, construction-specific standards of OOSHC Chapter 437, Division 3 — not Division 2. Division 2's definition section, OAR 437-002-0006, does not define "aisle," "passageway," "walkway," or "incline."

Of the enumerated building features described in OAR 437-002-0022(3)(a) and (f), the cleanroom ledge is most possibly understood as a "walkway." But even that label does not appear to encompass the ledge. Webster's New World Dictionary defines a "walkway" as "a path, passage, etc. for pedestrians, esp[ecially] one that is sheltered." WEBSTER'S NEW WORLD DICTIONARY 1502 (3d college ed. 1988). In the American Heritage Dictionary, a "walkway" is a "passage or path for walking." AMERICAN HERITAGE DICTIONARY 1949 (5th ed. 2011). These definitions make clear that the common understanding of a walkway is a feature intended "for" pedestrians, or human walking. The cleanroom ledge does not appear to have been intended or designed for pedestrian traffic. In fact, the record supports that the only reason cleanroom workers were walking along the ledge was due to the temporary condition of the cleanroom under construction. Absent any suggestion from Quirk to suggest otherwise, based on the record before the court, the cleanroom ledge cannot be understood as an aisle, passageway, walkway, or incline under the meaning of OAR 437-002-0022(3). Therefore, the rule does not apply and cannot support the OSEA claim.

B.    *Latter* McAlpine *Factors.*

Because Skanska may have violated applicable OSHA standards discussed *supra* in Part II.A.1 and, derivatively, the OSEA, under the next three prongs of *McAlpine*, the court must consider

whether Quirk was injured as a result of that violation, whether he was a member of the class of persons meant to be protected by those regulations, and whether he suffered the type of injury those regulations were intended to protect against.

First, the record shows, and Skanska does not refute, that Quirk's fall was a direct result of the regulatory violation underlying the OSEA violation, stemming from the uncovered trench. Second, Quirk, as a worker in Oregon, was within the class of people meant to be protected by the statute. *See* OR. REV. STAT. 654.003 (stating OSEA is intended to "ensure as far as possible safe and healthful working conditions for *every working person in Oregon*" (emphasis added)); *Cain*, 817 F. Supp. 2d at 1265 (holding that a plaintiff-subcontractor "clearly f[e]ll[] within the purview of statutes and regulations adopted for the protection of workers in Oregon"). Finally, Quirk's on-the-job injury was just the type the OSEA was intended to protect against. *See* OR. REV. STAT. 654.003 (stating also OSEA's purpose to "reduce the substantial burden, in terms of lost production, wage loss, medical expenses, disability compensation payments and human suffering, that is created by occupational injury").

Quirk therefore has satisfied the *McAlpine* test, and under *Cain*, the OSEA claim survives summary judgment. However, summary judgment is granted to the extent the OSEA claim relies on violation of OAR 437-002-0022(3).

III.     Negligence *Per Se.*

Quirk also asserts a claim of negligence *per se*, asserting violations of "state and federal regulations," including the aforementioned OSHA regulations that underlie the OSEA claim. As set forth in Part II.A, because *McAlpine* is satisfied with respect to those regulations, Quirk's negligence *per se* claim necessarily may proceed based on that alleged violation. *George*, 169 Or. App. at 478;

*see also Brown*, 150 Or. App. at 414 ("Given our conclusion that [safety regulations underlying plaintiff's OSEA claim] did apply to defendant . . . , plaintiff's negligence *per se* allegations based on those regulations were legally sufficient.").

However, in his response to the present Motion, Quirk argues his negligence *per se* claim is based also on violation of another ELL provision, ORS 654.310. ORS 654.310, separate from ORS 654.305's standards for "work involving risk or danger," states:

> All owners, contractors, subcontractors, or persons whatsoever, engaged in the construction, repairing, alteration, removal or painting of any building . . . or other structure, . . . shall see that all places of employment are in compliance with every applicable order, decision, direction, standard, rule or regulation made or prescribed by the Department of Consumer and Business Services pursuant to ORS 654.001 to 654.295, 654.412 to 654.423 and 654.750 to 654.780[, Oregon Occupational Safety and Health statutes].

OR. REV. STAT. 654.310. Thus, much like the OSEA, ORS 654.310 functions to provide a statutory cause of action for violation of safety regulations.

*Groves v. Max J. Kuney Co.*, 303 Or. 468, 470 (1987), remains the foremost case interpreting liability with respect to ORS 654.310. The parties here disagree on its effect.

*Groves* arose after a plaintiff-independent contractor fell from a bridge while working at a defendant-general contractor's construction job-site. *Id*. at 470. The case came before an *en banc* Oregon Supreme Court after a district court certified the question whether "an independent contractor [was] covered by the provisions of ORS 654.310 while working under contract with the defendant who was in charge of building a bridge?" *Id*. at 470–71. The Supreme Court answered no, concluding that "to recover under the provisions of the EL[L], the injured worker must be an employee of someone. Because an independent contractor is not an employee of anyone, he cannot recover under the EL[L]." *Id*. at 475. In so holding, the court examined the legislative history and

development of the ELL and ultimately rejected the plaintiff's "attempts to widely separate" ORS 654.305 and ORS 654.310. *Id.*

Quirk invokes *Groves* to assert summarily that ORS 654.305 and ORS 654.310 both extend liability to indirect employers. Skanska reads *Groves* more narrowly, contending the case answers only whether independent contractors can recover under the provision, not whether indirect employers can be liable under it and, therefore, maintains that the latter question remains unanswered.

Skanska is correct that *Groves* was silent on whether § 654.310 extends liability to indirect employers. But the *Groves* court's careful legislative analysis of the ELL is both relevant and instructive on the issue when read in conjunction with subsequent ELL jurisprudence. As discussed in Part I.B, subsequent ELL cases, specifically *Brown* and *Woodbury*, clearly extended ELL liability, at least under § 654.305, to indirect employers. *Brown*, 150 Or. App. at 396–97; *Woodbury*, 335 Or. at160. However, none of those cases addressed or even referenced ORS 654.310 or *Groves*. Still, *Groves*'s conclusion that § 654.305 and § 654.310 were borne from the same legislative intent and should not be separated strongly supports an interpretation that *Brown* and *Woodbury*'s extension of ELL liability to indirect employers coextends to ORS 654.310.

This interpretation is consistent with *Trout v. Liberty Nw. Ins. Corp.*, which appears to be the only case ever to cite *Groves*. There, the Oregon Court of Appeals noted, "[t]he courts have consistently held that only 'employees,' either directly against their own employer or indirectly through the common enterprise test, may maintain an action under the EL[L]," to distinguish not between indirect and direct employees, but rather between paid employees and "volunteers." *Trout v. Liberty Nw. Ins. Corp.*, 154 Or. App. 89, 97 (1998) (citing *Groves*, 303 Or. at 471–75 for its

proposition that "an independent contractor may not bring an action under the EL[L]" in contrast to *Jylha v. Chamberlain*, 168 Or. 171, 175 (1942), which held "that volunteers are not employees under the EL[L]").

Because the court concludes that ORS 654.310 imposes indirect employer liability under the ELL to the same extent and employing the same analysis as its companion provision, ORS 654.305, and because the court has already recommended summary judgment is inappropriate as to Skanska's status as an indirect employer under ORS 654.305, it is likewise inappropriate as to Skanska's indirect employer status under ORS 654.310.

To establish a ORS 654.310 violation, Quirk also must demonstrate that Skanska violated an "applicable order, decision, direction, standard, rule or regulation made or prescribed by the Department of Consumer and Business Services pursuant to ORS 654.001 to 654.295, 654.412 to 654.423 and 654.750 to 654.780." Again, Skanska argues that because OAR 437-002-0022 does not apply, there is no underlying regulatory violation to support the derivative ORS 654.310 violation.

That argument, however, ignores that OAR 437-002-0005 and OAR 437-003-0001 also were promulgated by the Department of Consumer and Business Services pursuant to ORS 654.025(2), and adopt by reference the OSHA regulations discussed in Part II.A.2. Therefore, the violated OSHA regulations, through their adoption into the *OOSHC*, also can support a ORS 654.310 violation. As such, ORS 654.310 may serve as an additional basis for Quirk's negligence *per se* claim, on which summary judgment is inappropriate.

VI. Negligence.

Quirk's final claim asserts common-law negligence. To prevail on a negligence theory under

Oregon law, a plaintiff must show (1) that the defendant owed him a duty, (2) that the defendant breached that duty, and (3) that the breach was the cause in fact of legally-cognizable damage to the plaintiff. *Brennen v. City of Eugene*, 285 Or. 401, 405 (1979).

The parties agree that at the time of the accident, Quirk was a business invitee. *See Taylor v. Baker*, 279 Or. 139, 146 (1977) (quoting Restatement (Second) of Torts § 332(3) (1965) ("A business [invitee] is a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land."). Beyond the ordinary duty of reasonable care, a "possessor of land" owes a business invitee a heightened duty of care: "to maintain the premises in a reasonably safe condition in order to protect [the invitee] from conditions that create[] an unreasonable risk of harm and to exercise that duty by either eliminating any such condition or warning of the risk to enable the invitee to avoid the harm." *Ault v. Del Var Properties, LLC*, 281 Or. App. 840, 845 (2016), *rev. denied*, 361 Or. 311 (2017); *see also Garrison v. Deschutes County*, 334 Or. 264, 272 (2002) (noting business invitee rule imposes a "special duty").

Skanska challenges Quirk's negligence claim on two, independently sufficient bases. First, Skanska argues it owed no duty to Quirk because he was a specialized, independent contractor at the time of the accident. Second, Skanska asserts that Quirk knew about the trench prior to his injury.

*A.* Yowell *Specialized-Contractor Exception*.

Skanska argues it had no duty to Quirk under the "specialized contractor" doctrine first articulated in *Yowell v. Gen. Tire & Rubber Co.*, 260 Or. 319 (1971). Quirk responds that the specialized-contractor rule does not apply because his injury did not relate to Charter's specialized expertise and because Skanska retained control over the cleanroom.

Yowell, an independent contractor-"sign builder, installer, and repairer," was hired to repair

a pole-mounted sign located on a defendant-store owner's property. *Yowell,* 260 Or. at 320. Yowell fell from his ladder when the sign shifted and slid down the pole. *Id*. at 321. He sued the store owner for negligence, arguing it had failed to "exercise reasonable care to provide a safe place [for him, an invitee,] to work." *Id*. at 322–23. The Oregon Supreme Court concluded that "[Yowell]'s employer, the independent contractor, held itself out to the public as being engaged in the business of manufacturing, installing and repairing all kinds of signs" and, therefore, the store owner was "entitled to assume . . . that [Yowell was] proficient and expert in detecting any defects in signs which formed a danger to those working in or around them. Defendant was not shown to have known of the defect in the sign. Nor was it shown to have had any expertise concerning signs." *Id.* at 324–25. Thus, the court excepted that one "who orders repairs or work to be done by a third party owes no duty . . . to discover and warn of any unknown dangerous conditions surrounding the work which fall within a special expertise or knowledge, not shown to have been had by the person ordering the work, and which the third party impliedly represents to the public that he possesses." *Id.* at 325.

Subsequently, the paper mill owner in *Brown*, under *Yowell,* had no duty to provide fall protection to an employee of the independent contractor hired to paint the mill because "the advisability and efficacy of [fall protection] measures was a matter peculiarly within [the painting contractor]'s special expertise or knowledge." *Brown.*, 150 Or. App. at 401 (internal quotation omitted). In *George*, *Yowell* barred recovery by the framing subcontract who fell while framing a house because the "obviousness of the risk" of falling from the third story of a partially constructed house, "coupled with the fact that that risk was inextricably intertwined with [the framer]'s performance of a specialized task over which defendant neither retained nor exercised control,

compel[led] that conclusion." *George,* 169 Or. App. at 474, 487–88.

Similarly, in *Boothby,* a logger was crushed by a log loader while working at the defendant's logging site. *Boothby*, 184 Or. App. at 141. The logger's employer had "contracted with [the defendant timber company] to perform [] logging work," and had "agreed to 'be solely responsible for providing and maintaining all equipment, safety and technique," and that "conduct and control of the work w[ould] lie solely" with the employer. *Id.* at 146–47, 159 (internal alterations omitted). The Oregon Court of Appeals held that, like the risk posed in *George*, the risk of injury by logging equipment was inextricably intertwined with the expert work the defendant had hired the logging subcontractor to perform. *Id.* at 159. That link was evidenced by the subcontract assigning sole responsibility to the subcontractor. *Id.* at 159–60. As such, the defendant contractor had no duty to the subcontractor under *Yowell*. *Id.* The Oregon Supreme Court later affirmed that decision, adding, "the [contractor merely] provided the tract of land that Intermountain logged. There is no evidence, however, that any defect in that tract led to the accident that resulted in Boothby's death." *Boothby,* 341 Or. at 47.

Later cases confirm that other "considerations relevant to whether a risk is inextricably intertwined with the plaintiff's employer's specialized task" include " the terms of the agreement between the defendant and the plaintiff's employer, and the defendant's reliance on the plaintiff's employer's expertise in the area and lack of involvement in or responsibility for the risk." *Spain,* 257 Or. App. at 790 (internal citations omitted) (citing *Boothby,* 184 Or. App. at 147, 159 and *George*, 169 Or. App. at 475, 487). Specifically, whether a subcontract sufficiently delegates liability for the risk to the subcontractor requires the same analysis as the right to control under the ELL. *Id*.; *see also George*, 169 Or. App. 472, 487 n.14 ("determination as to [the subcontractor]'s

EL[L] claim that there is no evidence that defendant exercised control over the activity . . . necessarily requires the same determination with respect to plaintiff's negligence claim.")

In *Yowell*, *George*, and *Boothby*, "it was beyond dispute that the causes of the plaintiffs' injuries were inextricably intertwined with the specialized tasks for which the defendants had hired the plaintiffs' employers." *Spain*, 257 Or. App. at 790–91; *see also Esko v. Lovvold*, 272 Or. 27, 29–30 (1975) (barring cable installer's recovery from a trailer-park owner after a cable pole the installer was climbing collapsed, because the danger of a collapsing pole was inherent to the installer's trade). *Spain v. Jones,* however, involved facts more analogous to those present here, in which the link between the subcontractor's injuries and specialized task was more attenuated. *Id.* at 779–81, 790–91. Spain's employer, a plumbing company, subcontracted with Jones to do the plumbing work on a house Jones was building in Oregon. *Id*. at 779. The "record did not reflect whether that contract was oral or written or what its terms were." *Id*. at 781. Jones lived in California and, though he was an "experienced general contractor," he was not licensed in Oregon. *Id.* at 780. He oversaw the project "by obtaining the necessary permits, hiring subcontractors, and arranging some of the inspections." *Id*. Jones had visited the site only a few times and was not present when the accident occurred. *Id*. The framing subcontractor on the project had previously installed fall protection in the house, but had removed those measures once the framer was finished with its respective tasks at the site. *Id*. at 780. Jones had "assumed" that fall protection would be in place when the other subcontractors worked at the house, but did not discuss or confirm that assumption with the framer. *Id*. While working inside the partially constructed house, Spain stepped off the bare ledge of an unfinished hallway, where no fall protection was in place, and fell nine feet. *Id.*

The trial court held that *Yowell* barred Spain's negligence claim and that neither Jones nor the framer retained a right to control under the ELL. *Id*. at 782. The Oregon Court of Appeals disagreed and held that a genuine issue of material fact existed as to whether Jones or the framer had the right to control the risk-producing activity, which precluded summary judgment on the ELL claim. *Id*. at 794. Factual issues also abounded regarding whether *Yowell* applied. *Id*. at 791. The court reasoned,

> Jones hired plaintiff's employer to plumb the house. In doing so, he may have relied on plaintiff's employer—the plumbing subcontractor—to make judgments about the necessity and advisability of fall protection on the second floor. But that is not the only way to understand the record. It is also possible that the parties intended, in keeping with industry custom, for the framers, not the plumber, to provide fall protection. If that is the case, then the risk of falling from the unprotected second floor was not inextricably intertwined with plaintiff's plumbing work; instead, it was a risk that plaintiff faced only because Jones . . . had failed to provide fall protection.

*Id*.

Skanska had far more involvement and control over both the cleanroom and Quirk's work than did Jones on his house project. Jones oversaw his project from afar and was not even licensed in the state. He was not present on the day of the accident. Moreover, the *Spain* court had no subcontract on which to rely to support any contractual delegation of safety responsibility to the subcontractor. Still, the informal circumstances of the project and potential industry custom were enough to preclude judgment as a matter of law on the *Yowell* issue. Skanska was not only present at the job-site on the day of Quirk's accident; it witnessed and directed each subcontractor's work there. As discussed above, Skanska held daily meetings at the site, conducted daily safety walks around the site, coordinated the workflow, and cleared access to the cleanroom.

Moreover, here, the record includes a written subcontract, which, under *Boothby* and *Spain*, is relevant to the link between the risk that caused Quirk's injury and Charter's specialized task. The

court's reasoning *supra* in Part II.B.2 explains that the Subcontract evidences that Skanska did not delegate all liability for the risk to Charter. And under *Spain* and *George*, the determination that summary judgment was inappropriate as to Skanska's right to control under the ELL has the same effect as to *Yowell*.

Skanska points to a provision of the Subcontract under which Charter was required to "take all actions necessary to provide for the safety of persons and property on . . . the project site in connection with the performance of the Work" and to "comply with all Subcontract requirements relating to safety including . . . all requirements under Applicable Law relating to safety, including . . . [OSHA regulations]." (Motion at 25 (quoting Subcontract, McLellan Decl., Ex. A, at 15, § 14.2).) Skanska argues that "by agreeing to this provision, Charter held itself out as having the necessary expertise and the ability to comply with applicable safety regulations and standards, including those regulations associated with 'holes.'" (*Id*. at 25.)

That argument construes the *Yowell* exception too broadly and overlooks the effect of the Subcontract on the whole. *Yowell* and its progeny make clear that to avoid liability under the specialized-contractor doctrine requires a close relationship between the risk posed and the work performed. Here, the risk posed was the potential someone would fall into the trench in the ledge. The work Charter held itself out as having expertise in was pipefitting. The only connection between the two was the apparent necessity to walk along the ledge to access the place where Charter's pipefitting was required. That connection — surrounding accessibility and movement within the cleanroom — relates directly to Skanska's unique purview as general contractor of the Lam project, not to Charter's specialized expertise as a pipefitter.

Moreover, Charter cannot have held itself out to have any expertise or ability with respect

to safety measures to protect against risks it did not know existed. Indeed, *Yowell* itself was premised largely on the fact that the defendant store owner did not know about the defect in the sign that rendered it dangerous. Here, Skanska knew and had caused the trench to be uncovered.

Finally, Skanska refutes that Quirk needed to walk along the ledge to access the pipefitting area. But that too is, by nature, a factual question inappropriate for disposition as a matter of law.

Therefore, like the risk in *Spain*, the risk of falling into cleanroom trench was not inextricably intertwined with Charter's pipefitting work; rather, it was a risk that Quirk faced only because Skanska failed to cover the hole. As such, the specialized-contractor doctrine does not bar recovery on Quirk's negligence claim.

B.      *Premises Liability*.

Thus, the general rules of premises liability govern this claim. "[T]ypically, a possessor's duty to protect a business invitee from an unreasonable risk of harm will be satisfied by a warning, because a warning will make the risk known to the invitee." *Ault,* 281 Or. App. at 849 (citing *Wilk v. Georges*, 267 Or. 19, 23–26 (1973)). However, the Oregon Supreme Court has "reject[ed] the categorical rule of the Restatement that an invitee's knowledge of a dangerous condition inevitably bars recovery," instead holding that "when an invitee knows of the risk, the possessor's duty is limited to protecting the invitee from a risk that remains unreasonable despite the invitee's knowledge." *Id.* at 449 (citing *Dawson v. Payless for Drugs*, 248 Or. 334, 340 (1967)).

Uneven surfaces like steps, particularly those with a "deceptively level appearance," even "if not 'unreasonably dangerous' as a matter of law," may still constitute unreasonable risks of harm that would trigger a possessor's duty to warn. *Glorioso v. Ness,* 191 Or. App. 637, 644 (2004) (citing *Hamilton v. Union Oil Company et al.*, 216 Or. 354, 359–60 (1959) and *Andrews v. R.W. Hays Co.*,

166 Or. App. 494, 505 (2000)).  The Oregon Court of Appeals has suggested that "a step located in a place where steps normally may [not] be found, . . . a surface of the same appearance both above and below, with[] deceptive lighting, [or] covered with slippery substances" are features with characteristics that could pose an unreasonable risk of harm.  *Id.* at 645.

*Ault v. Del Var Properties* is illustrative.  Ault was injured when she "tripped over the edge of a sidewalk" in front of a storage facility from which she rented a storage unit.  *Ault,* 281 Or. App. at 842.  The sidewalk was flush with the parking lot asphalt, except for one section in front of the facility's office, "where the pavement [wa]s approximately one to two inches above the level of the parking lot."  *Id*.  The trial court granted summary judgment for the facility, on grounds that the sidewalk was not "unreasonably dangerous" and that Ault knew of the risk because she testified "she had previously encountered the sidewalk edge without tripping and that she could have stepped over it had she seen it."  *Id*. at 844.  The Court of Appeals reversed, detecting "evidence in the record from which a jury could find that the uneven pavement edge was in a location where it would not be expected — indeed, that the pavement edge was even at other points, making the uneven edge all the more unexpected — and that there were distractions that could draw a person's eye away from the walkway."  *Id*. at 853–54.  As such, though the sidewalk was not an "unreasonably dangerous condition," a genuine issue of material fact existed "as to whether, in light of all the circumstances, the raised pavement presented an unreasonable risk of harm."  *Id.* at 850–51, 853– 54.

When attendant circumstances or the temporary condition of an otherwise harmless physical feature render it unreasonably dangerous, the party liable is the party responsible for those circumstances or condition.  *Hamilton*, 216 Or. at 358–59.  In *Hamilton v. Union Oil Company et al.*, Hamilton was injured when she tripped on a three-inch step at a gas station.  *Id.* at 357.

Hamilton testified she had "had no difficulty seeing" in the area, but"dim" lighting and "grease and oil on the floor" made the "grey concrete" floor "appear[] to be the same level." *Id.* at 358–59. Hamilton sued both the owner and the operator leasing the gas station. *Id.* at 357. The Oregon Supreme Court affirmed summary judgment for the owner, because it had no control over the lighting or oil on the floor; the only "condition" for which the owner was "responsible" was "the construction" of the step, which, absent the poor lighting and oily sheen, was in no other way "defective." *Id.* at 361. As to the operator, however, jury questions remained about whether the sheen, lighting, or failure to warn of the step rendered it unreasonably dangerous, because "if there was a dangerous condition due to the combination of the two-level floor, the uniform coloring, the dim light and slippery substances, it would have been the duty of the defendant[-operator] to give a warning to business visitors of the danger." *Id.* at 363–64. However, the question of whether "the [uniform] coloring or pattern of the floor gave a deceptively level appearance" was properly withheld from the jury because that fact "alone did not create a defective condition." *Id.* at 359–60, 363–64; *Glorioso v. Ness*, 191 Or. App. 637, 644 (2004) (summarizing *Hamilton*, 216 Or. at 363–64).

Skanska argues it had no duty to protect Quirk from the trench because he knew about it prior to his accident. Skanska cites excerpts of Quirk's testimony in which he acknowledged he "was aware there was a trench" because he "had worked in [the cleanroom] before." (Quirk Dep., Hydes Decl., Ex. 10, at 91:18–92:8.) However, Quirk also testified he had never before "crossed over that trench" because, previously, it had always been covered, and that morning, he "didn't see" the opening in the ledge "[b]ecause it was brand new painted white and everything was shiny and looked the same[ i]f you were standing on top . . . ." (*Id.* at 92:14–25, 95:2–7.)

Quirk's awareness of the trench's existence is not fatal to his negligence claim. First,

Skanska's position here incorrectly defines the relevant risk of harm in this case.  As *Glorioso*, *Ault,* and *Hamilton* make clear, the condition at issue here is not merely the structure or presence of the trench, but rather the combination of all the circumstances surrounding it, including its location along a narrow ledge, in a place where an opening would not normally be found; its deceptively uniform or level appearance; that it always previously had been covered and, therefore, hidden; and its recent visual transformation from the new coating blanketing the cleanroom's surfaces.  Quirk's deposition testimony highlights that, although conceptually he knew the opening in the ledge existed, it appears he remained unaware of exactly where it was located or that, on that day, it was uncovered. Just like Ault and Hamilton, Quirk did not see or appreciate the trench obscured by the epoxy, as he came upon it, sidestepping along the ledge.

Just as a jury in *Ault* could have found that the raised sidewalk step — which Ault had seen and even previously encountered — posed an unreasonable risk of harm, so too could a reasonable jury find that the uncovered trench — which Quirk never before had encountered, much less seen — posed an unreasonable risk of harm about which Skanska should have warned.  And under *Hamilton*, it is for the jury, not this court, to decide whether the discontinuous ledge; uniform color; new, shiny coating; lack of cover, guardrail, or warning flag; or any combination thereof rendered the opening an unreasonably dangerous condition.  Finally, even if the opening was not unreasonably dangerous, Skanska still had a duty to warn Quirk of its existence if it posed an unreasonable risk of harm to him.  Thus, summary judgment as to Quirk's negligence claim, too, is premature.

/ / / / /

/ / / / /

/ / / / /

*Conclusion*

To conclude, genuine issues of material fact preclude judgment as a matter of law. Accordingly, Skanska's motion for summary judgment, ECF No. 16, is DENIED, except to the extent it challenges Quirk's reliance on OAR 437-002-0022, which does not apply here.

IT IS SO ORDERED.

DATED this 30th day of May, 2018.


/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge